Please all rise. Hear ye, hear ye. This Honorable Appellate Court for the 2nd Judicial District is now in session. The Honorable Susan F. Hutchinson presides. Please be seated. Your Honor, the first case we've got this morning is 2-20-0712. The people of the state of Illinois thank you for having me, V. Kareem S. Rakin, Defendant Appellant. Arguing for the appellant, Mr. Jonathan Krieger. Arguing for the appellee, Ms. Victoria T. Joseph. Good morning all, and thank you for being here this morning. And Mr. Krieger, whenever you are ready, you may proceed. Thank you, Your Honor. Good morning. May it please the Court. Again, my name is Jonathan Krieger. I'm here for Farid Rakin. I plan this morning to argue Issue 1 and Issue 2, if I may. Issue 1. In this case, the detective who interrogated my client did everything he could to do to induce a confession, including making an illegal and false promise to release my client's girlfriend if he confessed. After the promise was made, my client admitted to committing the shooting. My client's statements, tainted by police misconduct, should have been suppressed. Don't we have to consider that as just one of the factors in and of itself, whether it was a lie, whether it was a promise, whether it was a threat? Those are all things that we consider with all of the other circumstances. That's right, Your Honor. It's a totality of the circumstances analysis in this case. I would suggest to you, though, that the nature of the promise that was made with regard to my client's girlfriend was extremely coercive, that it should be given a considerable amount of weight, more weight than, on the one hand, the lies that were told, but also, on the other hand, that he was middle-aged and had a criminal background. When reviewing whether or not the trial court erred in denying the motion to suppress statements, we look at the entire record, correct? That's right, Your Honor. Including the defendant's testimony at trial. What in the defendant's testimony at trial suggested that his statements were the product of coercion? I think that the video, more than my client's testimony at trial, indicated that. I'm talking specifically about his testimony at trial. What in his testimony suggested that his statements to the police that were videotaped were the product of coercive coercion or promises? He didn't explicitly say that I was coerced into making the statement. However, he did say that he was concerned with his girlfriend, and that was his primary concern. And there was evidence throughout the interrogation, something that Detective Schutz took advantage of before. With respect to the girlfriend, though, what was the fear of the charge that she would be charged with? It wasn't the murder. I think it was the murder. It was a little bit. Detective Schutz was a little ambiguous throughout, whether they were talking about the Waukegan case versus the Racine case. Racine case, right. Yes. The Racine case. It went back and forth a little bit, but when it came down to it, immediately before the confession, he was talking about the Waukegan case. He said, because Detective Schutz said, I'll go to the State's attorney and we'll get all the charges completely quashed. So if there was any ambiguity, he was saying that all of them would be dropped. It didn't seem like the Racine case was mostly what they were talking about. For instance, Detective Schutz said the charges could be dropped, had been dropped temporarily, but could they be dropped permanently. That's a reference to the Waukegan case, not to the Racine case. There was also, during the course of the conversation, during the videotape interrogation, suggestion that second-degree murder might be in play. Sorry, Your Honor. Detective Schutz mentioned second-degree murder, mentioned aggravated UUW, UUW by a felon. So those were also improper. A detective who's interrogating cannot make a suggestion of a particular benefit. That's the language that the courts use. And that was a suggestion. He was saying. But in fact, he's making suggestions that could and could have been facts. These are possible charges that could have resulted from the Waukegan case. There's no doubt that they could have, but that's not. A detective shouldn't be mentioning them because the law says that shouldn't be suggesting particular benefits. And so a benefit in this case would be a reduction from first-degree murder to second-degree or to a lesser gun charge. And by merely suggesting it, it wasn't appropriate. It was coercive. And the detective did far more with regard to, more than a suggestion with regard to Nicole Macy, my client's girlfriend. That was a specific quid pro quo. My client raised the possibility of, I'm sorry. Well, these two police officers have been involved in this case probably from the beginning in the investigations. They were the ones who had the charges cleared against the girlfriend. So there is a relationship here between them that it would seem we should consider as well as your client was very careful. But he ultimately decided, or at least it appears he decided to confess because these two police officers were being pretty straight with him. I don't think that they were being straight with him. They lied to him multiple times. But I think that the relationship that you're talking about is certainly relevant. Because what they had said is, and what Detective Schlatt said, is at some points he said, I went to the state's attorney and got it dropped. At other points he made it seem like he and his partner were the ones that had it dropped. He said, I'm not completely in charge. I'm not completely in control of the charges, indicating that he had a role in making the charges himself. At one point he says, if you admit to the drugs, I'm not going to charge Nicole Macy. Now, that wasn't his. He didn't have the power to charge her in the first instance. Well, you talk about deception and fingerprint on the gun, et cetera. Is a police officer's use of deception in procuring a confession improper? It's not. It's not inherently improper, but a police officer does that at their own peril. Because it is a factor that can be considered in terms of the involuntariness, in terms of the course of effect. And in this case, what didn't just happen once, Detective Schlatt's mentioned this nonexistent fingerprint match three times, mentions this camera, which supposedly saw my client, but he admitted that there was no such camera. And so, although it on its own doesn't render the confession involuntary, combined with the promises and the suggestions of benefits with regard to my client's son, excuse me, rendered the confession involuntary. And the trial court's denial of the motion to express was reversible error. Now, as your honors know, the ultimate question of whether it was voluntary is reviewed de novo, but specific circuit court findings were reviewed for manifest error. In this case, it was manifestly erroneous for the court to find that Detective Schlatt had clearly said that he had no control over the charging decisions. He had said, as I noted before, he had indicated that he did have the ability to charge Nicole in the case. And that ultimately, the important exchange, I think, is the one immediately before the confession, when he's asked, when my client says, well, if I confess, will you let her go? And he says, absolutely, I'll go to the state's attorney. And so you can look at that and say, well, that's a little ambiguous. Does he does that mean that he's actually going to that Detective Schlatt's claiming that he could drop the charges? So then my client follows up and says, will you release her today? And he pauses and says, yes, we'll go in. All the charges will be completely quashed. And so that's the quid pro quo that rendered the statement involuntary. Chivalry is not death. I think it's pretty clear that my client had a lot of feelings for his girlfriend, and that's what motivated him to give the statement. What's your next issue that you want to address? Issue two is the court's error in violating its own motion in limine and allowing Marquita Bronson to testify about Sierra Davis's intended driving route. Now, there were four statements here. Before trial, the defense had made a motion to have Marquita Bronson's testimony based on earlier statements she had given, barred her testimony about Sierra Davis's intent to be leaving. She said she was leaving the scene. Which was obviously a crucial question in terms of assessing self-defense and also second-degree murder. And so the State had no objection. The Court allowed the motion in limine, barring the statement as speculative. But when Marquita Bronson was on the stand, she testified, it looked like she was fitting to pull off. It perceived to me she was fitting to pull off. Two other statements similar to that. A few of her statements were not solicited, though, by the State. They were kind of, she just kind of went off, correct? That's right, Your Honor. She was, as opposing counsel knows, she was often an uncooperative witness. At the same time, you know, the State needs to prepare its own witnesses. It doesn't have total control over it. However, it could have been remedied by when defense counsel moved to strike the statements, and that was denied. And so even if it was something that you don't hold the State responsible for deliberate. In the Court overruled. Yes. The defense made three objections, and the Court overruled. And then after that, made a motion to strike. Isn't that something that the jurors could easily accept or reject on their own without any guidance from the Court? I mean, she's not a mind reader. That's right. She's not. But by overruling the objections, the Court sent a message that this is okay testimony. It's true, you know, but she shouldn't have been allowed to testify to that in the first place because it was so prejudicial. Well, but the defense attorney had a chance to cross-examine, and while maybe he chose not to, for a strategic reason, he didn't. Well, he did cross-examine her, but not about this specifically. Right. And there was a good reason that he wouldn't have because the motion in Lemonet had been granted. He wouldn't be ready. He wouldn't have the transcripts on hand to do this because he didn't expect that that's what would be happening. Well, he had heard her testimony there. He didn't like that. He apparently did not like it because, number one, it allegedly violated the motion in Lemonet, and, you know, he thought it was something that maybe something that should be done by an expert or something of that nature. But she said, hey, it looked like she was backing up or she was turning. She almost always qualified her statement with some positioning of the car. So how would that be a violation of the motion in Lemonet? I found that her testimony about the specifics of the car was not very specific, was vague, and that was kind of the problem. She said the wheel was turning. She wasn't clear on where the wheels were with regard to the curb, with regard to the driveway. I found her testimony of a specific description of the car, which would have been, as Your Honor says, proper to be vague and unhelpful. If I was a juror, I would be confused by what was going on. And so she kind of filled in the gaps through speculation. But the jurors had a picture of the car and where it landed, correct? That's right, Your Honor. And so they had certain additional information that they could sort of put over her testimony to try to make sense of it, correct? That's right, Your Honor. But I don't think that the existence of the photos rendered there in this case harmless because the photos were somewhat ambiguous as to where she was going. The car was going in neutral. The car was angled away from the driveway, but it wasn't angled very far. It certainly wasn't clearly leaving. The location of the gunshots were on the side of the car rather than the front or the back. It was ambiguous. And I think that Markita Bronson's testimony allowed the jurors, if they wanted to, to say, well, this is someone who was at the scene. And she says that it looked like he was – like Sierra Davis was about to take off. And when the defense objected, the court said, no, this is okay testimony. And so they could fill in the gaps given the kind of ambiguities in the forensic testimony. She was impeached, too, though. I mean, her credibility was certainly greatly impeached. I think that's right. She was drunk and on other drugs. Yeah. And there was contradictions with regard to – between her statement and the other statements. I don't think that she was a great witness. On the other hand, this – her testimony here did give the jurors, you know, kind of something that they could hold on to, given this kind of somewhat confused, somewhat ambiguous evidence in order to convict my client. Now, my opposing counsel argues that Markita Bronson's testimony was a lay opinion. That's a brand-new idea. That's not something that was brought up in the trial court. And it's not – and I don't think it was a valid lay opinion. In order for a witness to give a lay opinion, it must be helpful to a clear understanding of the case. In this case, it wasn't helpful because it was based on my reading, which isn't – you know, which isn't allowed. Well, how – I guess I am still perplexed. How was her – how were her statements different than if I was driving here this morning and I didn't get here because I had an accident, but I was able to say, that car drove right at me versus that car was turning? As she said, how were those two things different, and why wouldn't it be permitted? I think if she had said that the car was turning, I saw the car wheels turn towards – turn eastward, that would not be a problem at all. Your example, the car was coming towards me. I don't – I don't – that's not an opinion. That's – it was coming in my direction. Now, someone could try to, you know, what's the difference between coming at me versus coming towards me? But I think that that's like a reasonable perception. You could see you were standing somewhere. The car was accelerating towards it. Similarly, it wouldn't have been a problem if she had said, I saw the car turn. I heard the gear shift. But that's not what she said. She specifically said she didn't hear the shifting gear, correct? With a lot of her – she ended up saying that, but like a lot of her testimony, she was ambiguous. Initially, she said that she did when she was kind of led to say that. Then she said, oh, if I had said that, I would probably be lying. I think that's kind of – speaks generally to the nature of her testimony in terms of considering their – on this issue and also the 431B issue that she wasn't – the state's eyewitness testimony wasn't impressive. I think that all – that really – if it's okay to go back to issue one briefly, that affects the harmless error analysis in that issue because – You can finish your thought, please. Thank you. Thank you. Without the confession, the defense could have argued that an identity issue, that my client wasn't the one who committed the shooting in the first place. Unless Your Honor has any other questions? I have. Thank you. You may have a chance for a rebuttal if you choose. Thank you. Ms. Joseph. Good morning, Your Honors. Good morning. I am pleased to report counsel Victoria Joseph for the people of the State of Illinois. Since counsel started with the confession issue, the people will also begin there. As Your Honors know, we have a bifurcated standard of review that we're reviewing the factual findings and the credibility determinations and reverse only if they are against the manifest weight of the evidence and looking at the overall voluntariness of the – decision regarding voluntariness, as this Court has found, is an issue of fact and the overall legal challenge posed is reviewed de novo. The defendant relies on the Richardson case. And how would you distinguish that case and why is it improper to rely on that case? To be honest, Your Honor, I do not recall the facts of the Richardson case. He relies on the last factor in Richardson, which is threats, promises, deception to induce the defendant to confess. Was there anything else of the other six factors that the defendant – the other factors the defendant relied on other than that? No, Your Honor. So in this – as Your Honors know, you're addressing the totality of the factors, of which none of the other factors were against – or none of the other factors were against the voluntariness of the statement. This was a statement given to a defendant who was properly arrested on a warrant, given a random warning, said he understood them, was not physically abused, conversational tones. So we're going on one factor. And as courts have continually found, one factor is not just positive of the totality of the circumstances. Did Mr. – or did the defendant have prior criminal history that indicates that he may or may probably have been in a situation like this before? Yes, he did. And he specifically commented on that criminal history and the fact that he used the weapon as a reason why he didn't believe that he was going anywhere for this case. So even any discussion as to possible other charges, he even commented, I'm never going to see the streets again. So there was – that was not compelling him to make a confession when he already knew based on his own background and what happened in this case and that there was evidence against him. But there is no question that he was concerned about this 22-year-old girlfriend of his and he – and she had a child. I don't know if it was his child, but she was concerned. He was concerned about that. And that was a pretty significant concern of his, correct? It was a concern of his. He was the one that, as soon as the conversation with the officers began, he was asking about what was happening with her. The officers told him that she was in custody for her own protection and because of what happened in Racine. It was not because of the murder charges. They had already told him that those had already been dropped. So the discussion of the girlfriend was honest as to what was going on. But it also points out how extremely important that issue was to him and was his will not overcome as a result of this particular issue with the girlfriend. He was going to throw himself, you know, down for the girlfriend. Other than the fact that he didn't completely throw himself down and he was still in control over the information that he gave to the officers even after that point. And indeed, even at trial, stated, I didn't tell them everything. Didn't want to give them motive. Didn't want to disturb. That time. How long is this? A minute? Yeah, I think it's about a minute. But it's moving. Yes, but I don't want poor Miss Joseph to get four words out and then have to stop again. Because I'll forget where she was, even if she doesn't. I. I. I. We've got about 10 seconds. I think after the next pass, you can probably start again because it'll be. When the when the office when the defendant asked and continued to ask about maze for Maisie and not entirely sure how she pronounces her name. Basically, they have the option of I'm not allowed to talk about that. Or they're able to give the truth of the progress of the investigation. Why is that true? Where are they getting the truth as to her? They were. They had just they indicated they had no control over what racing was going to do with her, but would talk to the racing officers that he was also going to take the weight for what happened that day. And that is why she was in custody that day was due to those charges. In addition to her, they were being deceptive with him and that they told him, we found your fingerprints on a gun when in fact they never did. No, they did not. So, you know, as counsel says, looking at the totality of the circumstances in this confession, the issue with respect to the girlfriend wasn't the only issue in this confession. However, most of the statements as to the evidence, besides the fingerprints, were truthful statements as to the evidence. Maybe an exaggeration, the fact that there was a video, there was a video, that it did not implicate the defendant directly, that was not what was actually told to him. It just said we have video of what happened. They limited it to it without pushing that further. And again, police trickery does not per se invalidate a voluntary confession. So based on the totality of the circumstances in telling him what could happen to him, what could happen to his girlfriend, based on the evidence that they gathered, and that alone was not so heavily laden with trickery and specific promises as to tender his statements untrustworthy or unreliable when you consider all of the other factors that were in favor of a voluntary confession. How long was this interrogation? It was around two hours, Your Honor. And as this court has found in Mandolini, the three-hour interview was not a lengthy interview. I guess it also takes into account, though, how they were found, what was going on. Yes, he was arrested, I believe, at around 10.30 in the morning on an arrest warrant for this murder in Racine. He was in custody, assumingly going through booking and such, for about two hours, and the interview began at 12.20 p.m. So it was about four hours in total from the time he was arrested until the end of the interview. Your opponent went next to the admissibility of Bronson's statements. Yes, Your Honor. There were, as Justice Hutchinson points out, a lot of this was what she had perceived and the way the part was moved. There was a question asked by this prosecution, why do you think she threw the par in drive? And she answered, well, it perceived to me like she was preparing to pull off. How is that a proper question in not soliciting an opinion of a lay witness? The question, I believe the follow-up question was about hearing the gear move shortly around that time. The questions did seem to be asking for Bronson what she saw. Bronson, unfortunately, was not. In this case, it wasn't. In this question, it was why do you think? How could she speculate what the victim was thinking? The people don't believe the statements that she was making was as to the victim's intent or state of mind. They were attempts to describe what her car was doing. She, unfortunately, was not an IKEA manual that was giving a step-by-step, the car moved this direction, that direction. What she was doing was she gave a statement of what she was seeing happening, distinguishing this ramming into the car in the driveway, and now she's backing out of the driveway and looking to pull away. It eventually hits Bronson's car parked across the street as she does so. So she is trying to distinguish the earlier actions. She's not giving a good step-by-step, but she's testifying as to what she perceived, that this is a person backing out of a driveway to drive onto a street, which is something anyone who drives a car will understand. So she was a lame witness who tried to explain a person backing out of a driveway in the terms she best knew how, and it looked like she was trying to go away because she was no longer going toward the car. She was going away from the car. That offered the State to make the argument that she was no longer in any danger to the defendant. Correct. I mean, that opinion that she gave. Wasn't that the purpose of eliciting that opinion? The purpose of eliciting the opinion was to show that the car was no longer close to the defendant to be a danger to her. And there were photographs showing that. There were photographs showing where the car ended up. And where the defendant's car was. It was pushed all the way into the house. Into the house. Yes. And there was Garnett's testimony as well that said she saw the car halfway into the street when she heard the gunshots as well. So as much as her statements went from trying to describe visually what she observed into overlapping her beliefs as to where the victim was headed when she was moving her car, her testimony was a proper opinion testimony under Rule of Evidence 701 because it is based on common knowledge about how one leaves the driveway and turns the car to drive onto a street. It was helpful to understand where the car was at the time the defendant fired the gun and it was rationally based on her perception of what she saw, not on scientific knowledge. There was a motion to eliminate. Yes. It was granted. It was granted, Your Honor. And then when these questions were asked that violated the motion to eliminate, the court overruled the objections. Can the court ever violate its rulings on a motion to eliminate when they are always open to reconsideration because when they were considered within the motion to eliminate, it's within the vacuum of the evidence represented by the attorneys, you're now in the trial and hearing the evidence being presented at trial and the court can reconsider. The court did sustain the objections about some of the defendant's objections as to the victim's intent and then overruled the ones that went more to her observation and describing what the car was doing. Would a better practice for the court have been to excuse the jurors and make an offer of proof to determine whether or not this motion to eliminate, she was going to reconsider this motion to eliminate as opposed to doing it in front of the jury? There's always better courses of action courts can take, but we are looking at was it an abuse of discretion to rule as it did at the time during the trial and also whether this would have then been reversible error that it did not do a best practice and in this case it would not have been. All right. By the time she went to get in her car, that is Bronson, people were starting to come out, I think, correct? They were leaving. It was about 2 or 3 or 4 in the morning, as my son would say, not being precise. Well, there were people out that were watching her ramming the car and even before that when she was hitting the car because people brought the defendant out to view that as well. So there were people outside. Had her car been hit any time previous to this time when she was backing out, she's describing she was backing and turning the wheels and it appears like she was going to move off. Had her car, Bronson's car, been hit before that? I don't believe there was any specific testimony as to that. And her car hadn't been moved at that point since she had gotten there? Well, she had gone away and parked it there when she came back. Okay. So, but that was after. Oh, good. Now what's going on? Okay. They had their 2 hours or 2 minutes and 50 seconds. They don't get any more. I guess my point is, had she hit, if Bronson's car had not been hit before when she had been ramming? No, she had, there was testimony that she was only backing up a short distance. Okay. So. So now she's backing up a longer distance. Into the street. Into the street, and that's exactly what Ms. Bronson testified to, correct? That she was backing up and turning her wheels. That is correct. Is that, and it looked like she was going to pull off, I think, is something, or take off. It looked like she was trying to drive away, I believe was the statement that was objected to. Isn't that her interpretation of what occurred, rather than what, in fact, is an opinion about what she actually was doing? Wouldn't that be Ms. Bronson's interpretation of the actions that she saw, as opposed to reading Ms. Davis's mind? It's her opinion. No, I understand your question, and I think it comes down to is if you're asked to describe a car backing out and turning onto the street, are most people colloquially going to say it looked like the car was backing out to turn away? And it may have been a slight interpretation, but I do think she was trying to describe the specific things she was seeing occur. All right, you still have 2 minutes and 50 seconds if you want to do anything. Can I, Justice Hutchinson, can I ask you about the sentencing factors? Isn't it clear that the court considered an aggravating factor that the conduct caused serious harm to Davis, which is inherent in the offense? Did the court not use that sentencing factor improperly? The court acquired the transcripts, saw that it said that, acknowledged that it could not consider that as a factor, as it was inherent in the offense, and never changed the sentence. Did not change the sentence, but explained the context of why it was speaking about causing harm. What about her comment about the gun and about guns in general? Isn't that a factor inherent in the add-on? That she personally, I'm sorry, that he personally discharged that was a finding that was made and that would be inherent. However, judges are still allowed to talk about the extent in nature and the circumstances of the use of that weapon. And here talking about having an easily accessible loaded gun, firing it 7 times into, as your Honor pointed out, a party where people were leaving, these were circumstances that could consider beyond the fact that just a gun was used in the circumstance. But that would be true of every murder that a defendant uses a gun. That would be true of every murder. That's why we have the 25-year add-on. As far as considering the number of times he fired, how he was firing the gun, where he was firing the gun, to claim the fact that I was just, I wasn't really aiming, yet three of your bullets are directly toward her body based on the bullet holes in the car. That this wasn't a person who was shooting a gun in the air recklessly. This was a person who was shooting multiple times at a human being and the manner in which he was doing it was a proper consideration for the court. That doesn't concern me as much as the serious harm caused to Davis, which she repeatedly commented on, both at the sentencing as well as on the motion we consider. And then comes back and says, gee, I read it, I was wrong, but doesn't correct it at all, basically. Other than saying the reason she set the sentence where she did was based on the criminal history. And that was where the weight was given. That's why the court set it where it did. It explained that. So even if these statements were made, they were not the significant factor that set the sentence. All right, but when she says, I have considered as a factor an aggravation that defendant's conduct caused and threatened serious physical harm. The only person or entity she's talking about at that point is Ms. Davis. We don't see her say this was a neighborhood, that people were out there watching what was going on. And that he could have harmed someone else. Shouldn't she have done that? Because short of saying Mr. Raken killed Ms. Davis, what else? Why did she mention the threat of serious harm? The people maintain that speaking about picking up a loaded gun and discharging it multiple times, the judge knew the evidence at trial. Knew that there were additional people there. So in considering all of the evidence, it's still concerning the extent of the harm that he was causing. Are there any other questions, Your Honors? The people ask you to affirm the defendant's conviction and sentence. Thank you. Mr. Krieger. I just have two points with regard to Issue 1. First, my opposing counsel said that I characterized the video as an exaggeration. And that's not accurate. The detective said that my client was seen on video. And the only video that was introduced for the night of the shooting was people walking along afterwards in a nest video. He wasn't seen anywhere near that. That was a lie, and it should be recognized as a lie. Again, it's not a dispositive factor, but something that led to the course of confession. The second point is my opposing counsel points out that my client kept some information from Detective Schlutz, specifically who passed him the gun, and that showed that he was in control. But I don't think that that's an important fact, because he was concerned with Nicole Mazie. No one had alleged that Mazie was the one who had handed him the gun. What was important to him was getting her out of custody, and the statement that was elicited by Detective Schlutz got the information that he wanted, which was my client admitting to the shooting. She wouldn't be out and about going to Indiana and then ending up in Racine, Wisconsin, if she hadn't already been released from custody and the charges dropped against her, would she? She wouldn't be, but as soon as Detective Schlutz went beyond his initial statement that she's kind of not in trouble, he said that the charges could be brought back again. There's this idea of temporary versus permanently dropping, which isn't a legal concept, but it's something that he said in order to put pressure on my client. And the crucial change right before my client gave the admission, he's acting like he has control over whether she'll be charged or not, and that was part of a number of different comments that were made. He's constantly pushing on my client, saying that she's in custody, she's crying, her eyeball's out, and that he said, you know, what can we do to get her out? Well, yeah, but we talked about this a little briefly in your direct argument about the officer said they went to the state's attorney and went over their, I think, supervisor's suggestion and got the case dropped against her. That could mean a couple of things, but one thing it could mean is they went to the state's attorney and said, we can't prove this case against her, and it got dropped. So, I mean, the threat that she's going to be charged again, or the undercurrent that she's going to be charged again, seems to have been dispelled by the fact that that case was dismissed, doesn't it? I think we can, I think we as outside observers can say, oh, it looks like they didn't really have much of a case. There's this one witness who said it, and nothing new had come forward. But from my client's perspective, you can see before he gives a confession, he's quiet, he has his hands on his head, he is concerned about his girlfriend. So even though we can say, you know, they didn't have a case against her, he seemed to believe that they did. And if he didn't think that, there's no reason he would have brought up this idea that let her go. If he really thought that she was free and clear, he wouldn't, he would have just kept that information. He would have, or he would have confessed regardless of her status. But that was what was important to him, that she was in custody, that she could be facing charges. And he thought that maybe the charges could come back, and that's why he negotiated for her to be released. And that negotiation robbed his statement of its voluntary character. This is under harmless error. Ginsburg, you had to show here that the evidence was so closely balanced that the error alone threatened to tip the scales against the defendant. Do you feel that the statement tipped the scales against the defendant when all of the other evidence came in as it did? So that's the standard that you just recited would be the issue for Argument 3, the plain error, Rule 431b, which was not preserved. But in this case, the State has the burden of proving that it was harmless, that there was harmless. And a confession is the most powerful evidence that you can have against someone. In light of all of the other additional evidence that came in, the witness testimony, Bronson, although that was up to the jury to determine her credibility, she didn't sound extremely credible on paper. I don't know why. Again, I wasn't there, which is why you have the burden that you do. But his confession and then the forensic individual who was there and laid out the deceit. I mean, I understand it's the State's burden, but that's what the jury was looking at. How would we, with the burden that we have, overrule the fact factor in this case? So the standard in this case is, you know, whether it was harmless. This isn't a reasonable doubt argument. We're not making that argument. We don't need to give all deference to the State. We don't need to look at everything in the most positive light. The question is whether this could have made a difference, and it did make a difference. This is an admitting to doing the shooting. If it had come out, it would have made a difference. Thank you, Your Honors. Thank you. I thank you, counsel, for your arguments this morning and for traveling here from a bit of a distance in traffic. We will take the matter under advisement. We are now going to stand in adjournment. Thank you.